UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DAVID VINCENT CARSON,

Plaintiff,

v.

F. MARTINEZ, et al.,

Defendants.

Case No.:  16cv1736-JLS (BLM)

**REPORT AND RECOMMENDATION FOR ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**[ECF No. 63]**

This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.3(f) of the United States District Court for the Southern District of California. For the following reasons, the Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED IN PART AND DENIED IN PART**.

## PROCEDURAL BACKGROUND

On November 2, 2017, Plaintiff filed his First Amended Complaint ("FAC") alleging four claims for relief. FAC. Plaintiff alleges that (1) Defendants Martinez, Godinez, Silva, and LaRocca violated his First Amendment right to freedom of speech by retaliating against him for

complaining about their violations of his civil rights, (2) Defendants Silva and LaRocca violated his Eighth Amendment right to be free from cruel and unusual punishment when they assaulted him, (3) Defendant Garcia violated his Eighth Amendment rights when she failed to protect him from the use of excessive force by Defendants Silva and LaRocca, and (4) Defendant Casian violated his Eighth Amendment rights when she was deliberately indifferent to Plaintiff's medical needs. Id. at 3-8, 12-13.

On October 30, 2018, Defendants D. Garcia, F. Martinez, and G. Casian filed a motion for summary judgment arguing that (1) Defendant Garcia is "entitled to summary judgment as to Plaintiff's failure-to-protect claim because she did not witness or participate in the force incident[,]" (2) Defendant Martinez is entitled to summary judgment "because Plaintiff's retaliation claim is barred by the favorable determination doctrine[,]" and (3) Defendant Casian is entitled to summary judgment because "Plaintiff's constant and progressive medical care" does not demonstrate that she was deliberately indifferent to [Plaintiff's] medical needs. ECF No. 63-1 ("MSJ"). Plaintiff timely opposed the motion on January 31, 2019 [see ECF No. 77 ("Oppo.")] and Defendants did not file a reply. See Docket.

## LEGAL STANDARDS

### A. *Pro Se* Litigants

When a plaintiff appears *pro se*, the court must be careful to construe the pleadings liberally and to afford the plaintiff any benefit of the doubt. See Erickson v. Pardus, 551 U.S. 89, 94 (2007); Thompson v. Davis, 295 F.3d 890, 895 (9th Cir. 2002). This rule of liberal construction is "particularly important" in civil rights cases. Hendon v. Ramsey, 528 F. Supp. 2d 1058, 1063 (S.D. Cal. 2007) (citing Ferdik v. Bonzelet, 963 F.2d 1258, 1261 (9th Cir. 1992)); see also Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010) (stating that because "Iqbal incorporated the Twombly pleading standard and Twombly did not alter the courts' treatment of *pro se* filings; accordingly we continue to construe pro se filings liberally . . . ." This is particularly important where the petitioner is a pro se prisoner litigant in a civil matter).

### B. Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact,

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party has the initial burden of demonstrating that summary judgment is proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate.  Id. at 322-24.  The opposing party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256 (citation omitted).

A court may not weigh evidence or make credibility determinations on a motion for summary judgment; rather, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  Id. at 255.  If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999) (citing T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).  In addition, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 256 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-159 (1970)).

## C.    Section 1983

42 United States Code Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States.  See 42 U.S.C. § 1983; Marsh v. Cty. of San Diego, 680 F.3d 1148, 1152 (9th Cir. 2012).  A person acting under the color of law deprives another "of a constitutional right, within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains].'"  Preschooler II v. Clark County Sch.

Bd. of Trustees, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

### D.    Evidence the Court May Consider on Summary Judgment

In evaluating a motion for summary judgment, a court may only consider admissible evidence.  See Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002).  A party may not create a triable issue of fact merely by presenting argument in its legal memoranda.  See S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982); see also Estrella v. Brandt, 682 F.2d 814, 819–20 (9th Cir. 1982) (on summary judgment, statements in legal memoranda are not evidence and "do not create issues of fact capable of defeating an otherwise valid summary judgment motion").  However, if a *pro se* plaintiff submits a verified pleading, the court must consider the factual contents of the verified pleading.  See Lopez v. Country Ins. & Fin. Serv., 252 Fed. App'x 142, 144 n. 2 (9th Cir. 2007) (affirming summary judgment in favor of the defendant where the *pro se* plaintiff "failed to submit any admissible evidence in opposition to the defendants' motion for summary judgment ...," although observing that "[b]ecause [the plaintiff] was representing himself *pro se*, had he signed his pleadings and/or motions under penalty of perjury, the district court would have been required to treat them as evidence for the purpose of summary judgment); see also; Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (considering plaintiff's evidence where plaintiff "attested under penalty of perjury that the contents of the motions or pleadings are true and correct"); Harris v. Shelland, 2017 WL 2505287, at *4 (S.D. Cal. June 9, 2017) ("neither an unverified complaint nor unsworn statements made in the parties' briefs can be considered as evidence at this [summary judgment] stage"); and Barragan v. Flynn, 2017 WL 5070037, at *2 (S.D. Cal. Nov. 3, 2017) (same).

In Fraser v. Goodale, 342 F.3d 1032, 1036-1037 (9th Cir. 2003), the court reversed a grant of summary judgment, holding that the district court should have considered unsworn, arguably inadmissible statements written by the plaintiff in a diary.  The Ninth Circuit reasoned

4

that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." Id. at 1036-1037. The court opined that the contents of plaintiff's diary "were mere recitations of events within [the plaintiff's] personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways," including through plaintiff's testimony. Id. Because the contents could be presented in an admissible form at trial, the court concluded that diary's contents should have been considered as part of the summary judgment motion. Id.; see also Rosenfeld v. Mastin, 2013 WL 5705638, *5 (C.D. Cal. Oct. 15, 2013) (considering plaintiff's unsworn statements made in the third amended complaint and in the opposition because plaintiff "plainly has personal knowledge of the content of these statements and could present the statements in admissible form through his own testimony at trial," but not considering plaintiff's speculative statements regarding a particular claim where there was no indication plaintiff had personal knowledge of the claim); Wilson v. Med. Servs. Div., 2017 WL 1374281, at *7 (S.D. Cal. Apr. 13, 2017) (report and recommendation denied in part on other grounds) (finding that plaintiff failed to show a triable issue of material fact even after considering plaintiff's opposition to the motion for summary judgment that was not signed under penalty of perjury) (citing Rosenfeld, 2013 WL 5705638 at *5).[1]

---

[1] Several Ninth Circuit cases have interpreted Fraser to permit the consideration of unverified pleadings, unsworn memoranda, and other forms of inadmissible material at the summary judgment stage. See Jeffries v. Las Vegas Metro. Police Dep't, 713 F. App'x 549, 549–51 (9th Cir. 2017) (affirming district court's grant of summary judgment to defendant on plaintiff's 42 U.S.C. § 1983 claims and finding district court did not err in considering the exhibits attached to defendant's motion for summary judgment even though some of the exhibits were not authenticated "because a competent witness with personal knowledge could authenticate the exhibits at trial") (citing Fraser, 342 F.3d at 1036-37); see also Singleton v. Lopez, 577 F. App'x 733, 736 (9th Cir. 2014) (noting that "[i]t is not controlling at the summary judgment phase that the evidence was hearsay, so long as the evidence could be presented in an admissible form at trial," but finding that the magistrate judge did not abuse his discretion in refusing to admit a 2011 prison report where the statements were not relevant to pro se plaintiff's 42 U.S.C. § 1983 claims.) (citing Fraser, 342 F.3d at 1037); Aholelei v. Hawaii, Dep't of Pub. Safety, 220 F. App'x 670, 672 (9th Cir. 2007) (finding that the district court abused its discretion in not considering any of plaintiff's evidence when evaluating whether there had been a constitutional violation by prison officials because the evidence, which consisted primarily of litigation and administrative

16cv1736-JLS (BLM)

Plaintiff's opposition was signed under penalty of perjury [see Oppo. at 23] so the Court will consider the relevant factual statements made by Plaintiff in the opposition in evaluating the pending motion. See Jones, 393 F.3d at 923 ("because Jones is *pro se*, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct"). Plaintiff's FAC was not signed under penalty of perjury. FAC at 16. Plaintiff's unverified FAC contains factual statements regarding his claims of Eighth Amendment violations and retaliation about which Plaintiff has personal knowledge. FAC. Because Plaintiff could testify under oath at trial regarding his personal knowledge, the Court will consider those statements. See Fraser, 342 F.3d at 1036-1037. This conclusion is further supported by the fact that Defendants do not object to consideration of Plaintiff's unverified FAC or the evidence submitted in support of the complaint. See Torres v. Rite Aid Corp., 412 F. Supp. 2d 1025, 1028, n.2 (N.D. Cal. 2006) (accepting as competent evidence unsworn declarations not made under penalty of perjury where defendant did not object to the deficiencies) (citing United States ex rel. Austin v. W. Elec. Co., 337 F.2d 568, 574–75 & n. 19 (9th Cir. 1964) (holding that court properly considered technically defective affidavits submitted in connection with summary judgment motion in light of opponent's failure to object); Scharf v. U.S. Attorney Gen., 597 F.2d 1240, 1243 (9th Cir. 1979) ("Generally ... formal defects [such as an affidavit not being based on personal knowledge] are waived absent

---

documents involving another prisoner and letters from other prisoners, "would be admissible at trial if the other inmates were called as witnesses.") (citing Fraser, 342 F.3d at 1036); and Santa Ana Police Officers Ass'n v. City of Santa Ana, 723 F. App'x 399, 402 (9th Cir. 2018) (affirming district court's granting of summary judgment on Plaintiffs-Appellants' 42 U.S.C. § 1983 claim and finding that the court did not improperly rely on Defendants' exhibits because they are not authenticated business records as that would "ignore[] the fact that evidence that is not currently in a form that is admissible at trial is 'admissible for summary judgment purposes [if it] 'could be presented in an admissible form at trial.'" (citing Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 846 (9th Cir. 2004) (quoting Fraser, 342 F.3d at 1037)).

a motion to strike or other objection....").

## DISCUSSION

### A.    First Amendment Retaliation Claim Against Defendant Martinez

Plaintiff alleges that Defendants Martinez, Godinez, Silva, and LaRocco violated his First Amendment right to free speech by retaliating against him for filing complaints and that they conspired to chill Plaintiff's free speech "through intimidation, harassment, retaliation, physical and verbal abuse and eventual assault." FAC at 13. Plaintiff alleges that at the beginning of November 2013, he was harassed by Defendant Martinez who excessively searched Plaintiff's person and cell and denied Plaintiff recreational activities, essentially confining Plaintiff to his cell. Id. at 3. When Plaintiff complained to Defendant Martinez' supervisor, Defendant Martinez told Plaintiff "I'm going to get you." Id. Three days later, on November 13, 2013, Defendant Martinez prepared a false Rules Violation Report ("RVR") stating that Plaintiff refused to provide a urine sample for a drug test. Id. at 4. Plaintiff alleges the RVR was "false." Id. Plaintiff alleges that after the RVR, Defendant Martinez continued to perform daily searches of Plaintiff's cell and to deny Plaintiff recreational time which led Plaintiff to again complain to Defendant Martinez' supervisors. Id. at 4. Plaintiff's cell was later searched by Defendant Godinez who confiscated and destroyed some of Plaintiff's property. Id. When Plaintiff requested that Defendant Godinez return his property, Defendant Godinez responded with "[a]re you going to tell on me too?" Oppo. at 9. Plaintiff alleges that Defendant Martinez conspired with Defendant Godinez and others to "silence [P]laintiff's complaints." Id.

Defendants contend that Plaintiff's retaliation claim against Defendant Martinez is barred by the favorable-termination doctrine set forth in Heck v. Humphrey, 512 U.S. 477, 489 (1994) because the RVR upon which he bases his claim has not been invalidated or overturned.[2] MSJ

---

[2] Defendants state that "Plaintiff alleges a single claim for retaliation against Martinez." MSJ at 5. However, a careful review of the FAC shows that Plaintiff also is alleging a conspiracy claim against Defendant Martinez. See FAC at 13 ("Defendants Martinez, Godinez, Silva, and LaRocco violated plaintiff's First Amendment right to Free Speech collectively through a conspiracy to chill the effects of plaintiff's complaints through intimidation, harassment, retaliation, physical and verbal abuse and eventual assault"); see also Oppo. at 8 ("Plaintiff is challenging defendant

7

at 5-6.  Plaintiff responds that the <u>Heck</u> bar does not apply to his retaliation claims against Defendant Martinez because Plaintiff is not attacking just the false disciplinary report; he is challenging all of the retaliation he suffered at the hand of Defendant Martinez as well as the conspiracy with other officers.  Oppo. at 10.

### 1.    Legal Standard

The Supreme Court announced the "favorable termination doctrine" by holding that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness could render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a writ of habeas corpus.

<u>Heck</u>, 512 U.S. at 486-87.  "Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  <u>Id.</u> at 487.  The favorable termination doctrine has been extended to prison disciplinary actions involving a loss of good-time credits.  <u>See</u> <u>Edwards v. Balisok</u>, 520 U.S. 641, 643-44 (1997). However, the doctrine does not prohibit a civil rights claim if the claim does not necessarily implicate the underlying disciplinary action.  <u>See</u> <u>Sevilla v. Maldonado</u>, 2017 WL 4325343, at *2 (S.D. Cal. Sept. 29, 2017) (citing <u>Muhammad v. Close</u>, 540 U.S. 749, 754-55 (2004)).

### 2.    Analysis

Defendants argue that Plaintiff's retaliation claim against Defendant Martinez is "<i>Heck</i>-barred because the rules violation report upon which his claim is based has not been invalidated or overturned."  MSJ at 6.  The RVR was the result of a search that was conducted by Defendant

---

Martinez's . . . retaliatory actions in their totality as a violation of free speech, which involved . . . enlisting other officers in a conspiracy to retaliate against and punish plaintiff"), 9 ('Martinez enlisted other officers to accomplish his goal to silence plaintiff's complaints"), and 10 (Martinez is the linchpin in the retaliation because he began the retaliation and instigated others to do so as well on his behalf").

8

Martinez after he smelled marijuana coming from Plaintiff's cell. ECF No. 63-2, Declaration of John P. Walters in Support of Defendants' Motion for Summary Judgment ("Walters Decl.") at Exh. B. While the search did not end with Defendant Martinez finding any marijuana, he did find ashes in the toilet. Id. When Defendant Martinez ordered Plaintiff and his cellmate to submit to a urinalysis test, Plaintiff refused. Id. After a review of his RVR, Plaintiff was found guilty of refusing a urinalysis. Id. He was then

> Assessed 30 days of Parole Credit forfeiture for a Division "F" offense a 1st offense.

> Assessed 30 days of Loss of Privileges (LOP), to include the following : Minimum canteen only, no quarterly packages, no telephone privileges, and no night-time yard/dayroom privileges, pursuant to 3315(f)(5)(B) as a 1st offense, to commence on 11/29/2013 and terminate 12/28/2013.

> Place[d] on one (1) year Mandatory Random Drug Testing (MRDT) with a minimum of 1 test per month, effective 11/29/2013 through 11/28/2014, per CCR 3315(f)(4) as a 1st offense, and is hereby informed of the requirements pursuant to 3315(f)(4)(D).

> Assessed 90 days of Loss of Visits effective 11/29/2013 through 2/28/2014, to be followed by 90 days of Non-Contact Visiting effective 2/29/2014 through 5/29/2014, pursuant to CCR 3315( £) (5)(1) as a 1st offense.

> Refer[red] to Classification for placement in "Narcotics Anonymous" or related program to the extent chat such a program is available and the inmate meets all eligibility requirements, pursuant to CCR 3315(f)(5)(J) , as a 1st offense.

Id. Plaintiff does not allege that this RVR conviction has been invalidated, seek to overturn the disciplinary findings, seek to shorten his sentence or seek expungement. Oppo. at 8. Accordingly, to the extent Plaintiff's retaliation claim against Defendant Martinez is based on the November 13, 2013 RVR and conduct alleged therein, the Court **RECOMMENDS** that Defendants' summary judgment be **GRANTED** based on the Heck doctrine. However, Plaintiff's retaliation claim is not based only on the RVR. Plaintiff also alleges that beginning around November 5, 2013, eight days prior to the issuance of the RVR, Defendant Martinez "conducted multiple daily excessive and unnecessary searches of plaintiff's persona [sic] and cell with no legitimate penological interests, calculated to harass and intimidate plaintiff into stopping his complaints" and restricted Plaintiff to his cell, depriving him of activities and programs. Oppo.

at 9; see also FAC at 3. Plaintiff further contends that the retaliation continued after the RVR was issued when Defendant Martinez enlisted Defendant Godinez to also search Plaintiff's cell. Id. Finally, Plaintiff explicitly states that his "claims against Martinez are clearly not attacking the false disciplinary report as it is only incidental to the main issue, retaliation against free speech." Id. at 10. Defendants do not argue that Plaintiff's retaliation claims regarding the searches that took place of his person and his cell unrelated to the search described in the RVR are barred by Heck. A finding that the non-RVR related searches that Plaintiff experienced were retaliatory in nature would not necessarily invalidate his loss of good time credits for the RVR violation. Accordingly, to the extent Plaintiff's retaliation claim against Defendant Martinez is based upon conduct unrelated to the conduct underlying the RVR, the Court **RECOMMENDS** that Defendants' motion be **DENIED**. Defendants do not move for summary judgment on Plaintiff's retaliation claims against any of the other Defendants or on any basis other than a Heck bar. MSJ. Accordingly, those claims will move forward.

### C. **Eighth Amendment Claim - Failure to Protect**

Plaintiff alleges that he was subjected to cruel and unusual punishment when Defendant Garcia "fail[ed] to intervene and stop defendants Silva and LaRocco from physically assaulting plaintiff and by her failure to report her observations to her superiors or write a report as a witness to plaintiff's assault." FAC at 13. Defendants argue that Defendant Garcia is entitled to summary judgment "because she did not witness the incident, and even if she did, there is no evidence that she could have prevented it." MSJ at 3-5. Plaintiff responds that Defendant Garcia is not entitled to summary judgment because "conflicting evidence exists that creates a genuine issue of material fact." Oppo. at 3. Plaintiff notes that several witnesses have provided declarations contradicting Defendant Garcia's position that she did not witness Plaintiff's assault and that Defendant Garcia presents no evidence apart from "her own self-serving statements." Id.

#### 1. Legal Standard

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of the inmates." Lemons v. A. Camarillo, 2017 WL 3492146, at *5 (S.D.

10

Cal. Aug. 15, 2017) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984); (citing DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.")).  To establish a violation of this duty, an inmate "must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to the inmate's health or safety.  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  Additionally, because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," evidence must exist to show the defendant acted with a "sufficiently culpable state of mind."  Lemons, 2017 WL 3492146, at *5 (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991) (internal quotation marks, emphasis and citations omitted)) and (citing Hudson, 503 U.S. at 5, 8)).

In a failure to protect case, a sufficiently culpable state of mind "is one of 'deliberate indifference' to inmate health or safety."  Lemons, 2017 WL 3492146, at *5 (quoting Farmer, 511 U.S. at 834).  Deliberate indifference to an inmate's well-being is shown when prison officials know of and consciously disregard an excessive risk of harm to an inmate's health or safety.  Farmer, 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.  An inmate is not required to show that prison officials believed the serious harm would occur.  Id. at 842.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id.  A prison official's knowledge of the risk "can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it."  Stone v. Nielsen, 2018 WL 1512592, at *5–6 (D. Idaho Mar. 27, 2018) (quoting Johnson v. Johnson, 385 F.3d 503, 524 (5th Cir. 2004)).  Mere negligent failure to protect a prisoner from assault does not comprise a constitutional violation.  See Davidson v. Cannon, 474 U.S. 344, 347-48 (1986).

"A prison official can violate a prisoner's Eighth Amendment rights by failing to intervene."  Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir.1995).  "[H]owever, officers can be held liable

16cv1736-JLS (BLM)

for failing to intercede only if they had an opportunity to intercede." <u>Campbell v. Murrietta</u>, 2015 WL 5997169, at *3 (C.D. Cal. May 22, 2015) (quoting <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1289 (9th Cir.2000), as amended (Oct. 31, 2000); <u>see also</u> <u>Richards v. Foutch</u>, 2014 WL 4449822 at *7 (C.D. Cal. Sept. 9, 2014). ("A prison official may be held liable for such failure to intervene, however, only if the official was aware that the inmate faced a specific risk of harm from the other prison official's use of excessive force and had a reasonable opportunity to intervene to stop it.")).

2.  <u>Analysis</u>

Defendants argue that Defendant Garcia is entitled to summary judgment because she did not witness the alleged assault and, even if she did, there is no evidence that she could have prevented it from occurring. MSJ at 3. Defendants cite to Defendant Garcia's declaration to support their position. <u>Id.</u> at 4. In the declaration, which was signed under penalty of perjury, Defendant Garcia states that after opening the door of the dining hall and ordering Inmate Florence to keep walking, she went back inside the dining hall where she was working and did not see the incident that Plaintiff alleges followed. ECF No. 63-3, Declaration of Defendant D. Garcia ("Garcia Decl.") at ¶ 3-¶ 4; <u>see also</u> Oppo. at 37-38. She further declares that she did not complete a CDCR 837 Crime/Incident Report because she did not witness or participate in the alleged incident. <u>Id.</u> at ¶ 5.

The Crime/Incident Reports from Defendants Arguilez, LaRocco, Silva, and Nevarez and Security Patrol Officer Cruz also support Defendants' argument that Defendant Garcia did not witness the incident. FAC at 43-56. In the reports, the officers provide their accounts of the Crime/Incident and identify all witnesses to the Crime/Incident. <u>Id.</u> The Crime/Incident Reports completed by Officer Cruz and Defendants Arguilez, LaRocco, Silva, and Nevarez do not list Defendant Garcia as a witness to the alleged incident. <u>Id.</u> at 48-57; <u>see also</u> Oppo. at 40-41. Additionally, none of the narratives in the Crime/Incident Reports completed by Officer Cruz and Defendants Arguilez, LaRocco, Silva, and Nevarez mention Defendant Garcia in any way. FAC at 43-56.

Plaintiff opposes Defendants' motion and argues that genuine issues of material fact exist.

12

Oppo. at 2-7. In support of his position, Plaintiff submitted evidence, including five inmate declarations that were signed under the penalty of perjury, that he argues demonstrate that Defendant Garcia was present during the incident and witnessed his alleged assault. FAC at 58-63. Inmate Brown's declaration states that Defendant LaRocco ordered Plaintiff to stop walking, at which point Defendant Garcia exited the chow hall and followed Defendant LaRocco towards Plaintiff. Id. at 58; see also Oppo. at 45. Immediately thereafter, Defendant LaRocco ordered Plaintiff to get down, the prison PA system ordered everyone to get down, and Defendant Silva charged at Plaintiff who was kneeling on the ground. Id. Inmate Burns declares that after Plaintiff was slammed to the ground by a correctional officer who yanked Plaintiff's arm and bounced on his back, a Sergeant came over to see what was going on and was informed by a correctional officer that Plaintiff was resisting and that Inmate Florence said "Get the fuck out of my way to Garcia," which Inmate Florence denied. Id. at 60; see also Oppo. at 48. Inmate Burns does not state that he heard the comment or saw Defendant Garcia. Id. Inmate Houston declares that after the prison PA system ordered everyone to get down, "[a] female officer, who was standing several feet from them stepped aside" and Defendant Silva slammed Plaintiff into the ground. Id. at 61; see also Oppo. at 43. Another female officer then ordered Houston to sit on the ground. Id. Inmate Florence declares that he was exiting the chow hall with other inmates when he noticed Defendant Silva holding Inmate Houston against the wall. Oppo. at 50. Inmate Florence stopped to watch and Defendant Garcia told Inmate Florence and the others to keep walking. Id. As they complied, Inmate Florence heard Defendant Silva tell Defendants Garcia and LaRocco to get Plaintiff. Id. Defendants LaRocco and Garcia then passed Inmate Florence. Id. Inmate Florence next declares that Defendant Garcia stopped suddenly in front of him and ordered him and others to stop. Id. Defendant Garcia refused to move out of Inmate Florence's way when he asked her to do so. Id. Shortly thereafter, Defendant LaRocco ordered Plaintiff to get down and Defendant Silva came over to Plaintiff and began yanking his arms and forcing Plaintiff to the ground. Id. Inmate Florence notes that he filed an Inmate Appeal because the officers involved filed false reports and attempted to cover up the fact that Defendant Garcia was present during the incident. Id. at 51.

16cv1736-JLS (BLM)

Finally, Plaintiff's declaration states that after he exited the chow hall, he saw Inmate Houston "being accosted" and slowed down to watch. Oppo. at 29. Defendant Garcia then exited the chow hall and ordered Plaintiff and others to keep walking. Id. Defendants Garcia and LaRocco began following Plaintiff, eventually ordering him to stop. Id. At that point, Defendant LaRocco ordered Plaintiff to get down as Defendant Garcia stood several feet away watching the exchange. Id. Plaintiff was then blindsided and assaulted. Id. at 30. While he lost track of Defendant Garcia during the assault, once it was over and Plaintiff was handcuffed, he noticed Defendant Garcia in the same position she had been before the assault. Id.

Here, the evidence submitted by Defendants conflicts with the evidence submitted by Plaintiff creating triable issues of material fact as to whether Defendant Garcia was present during the alleged assault, had the opportunity to intervene, and deliberately failed to do so. Accordingly, the Court **RECOMMENDS** that Defendants' motion for summary judgment on this issue be **DENIED**.

### D. <u>Eighth Amendment Claim – Deliberate Indifference to Medical Needs</u>

Plaintiff alleges that he was denied adequate medical care in violation of his Eighth Amendments rights by Defendant Casian. FAC at 8. Specifically, Plaintiff alleges that after submitting requests for medical care, he met with Defendant Casian who refused to examine him or provide him with medical treatment, and who improperly cancelled all of his permanent medical accommodation chronos and denied him an MRI despite a recommendation that one be performed. Id. at 8-10.

Defendants contend that Defendant Casian is entitled to summary judgment. MSJ at 6-9. Defendants note that the medical records show that Plaintiff received professional and responsive medical care from Defendant Casian. Id. at 7.

Plaintiff argues that Defendant Casian is not entitled to summary judgment as she denied him appropriate treatment for months and only provided treatment after Plaintiff filed numerous grievances. Oppo. at 12. Additionally, Plaintiff argues that Defendant Casian arbitrarily revoked his medical chronos despite the "unrefutable" fact that the chronos were intended to be permanent. Id. at 22-23. Plaintiff further argues that Defendant Casian's treatment of Plaintiff

16cv1736-JLS (BLM)

extended well beyond negligence and was clearly deliberate indifference.  Id. at 20-21.

    1.    Legal Standard

    "Prisoners can establish an Eighth Amendment violation with respect to medical care if they can prove there has been deliberate indifference to their serious medical needs."  Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  Such a claim has two elements: "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Second, the plaintiff must show the defendant[s'] response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)); see also McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) ("[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.").  By demonstrating the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  See Farmer, 511 U.S. at 834.

    If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.  See id.  Proof that a defendant acted with deliberate indifference is required to satisfy the subjective prong of an Eighth Amendment claim.  See id.  Deliberate indifference requires proof of facts sufficient to demonstrate that a prison official acted with a culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  "Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person 'knows of and disregards an excessive risk to inmate health and safety.'"  Gibson v. Cty of Washoe, Nev., 290 F.3d 1175, 1187-88 (9th Cir. 2002) (quoting Farmer, 511 U.S. at 837), overruled on other grounds by Castro v. Cty. of Los Angeles, 833 F.3d 1060 (9th Cir. 2016).

Deliberate indifference to serious medical needs of prisoners "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)). However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle, 429 U.S. at 105. "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" Id. at 105-06. The indifference to medical needs must be substantial; inadequate treatment due to "mere malpractice, or even gross negligence, does not suffice" for a constitutional violation. Bennett v. Dhaliwal, 721 F. App'x 577, 579 (9th Cir. 2017) (quoting Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)); see also Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Accordingly, a mere delay in medical treatment, without a showing of resulting harm, is insufficient to support a deliberate indifference violation. See Edwards v. High Desert State Prison, 615 F. App'x 457 (9th Cir. 2015) (citing Wood, 900 F.2d at 1335); see also Colwell, 763 F.3d at 1081. "In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect." Wood, 900 F.2d at 1334 (citation omitted).

"A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." McGuckin, 974 F.2d at 1060. Facts indicating that the official "sat idly by as [the prisoner] was seriously injured despite the defendant's ability to prevent the injury" or that the official "repeatedly failed to treat an inmate properly or that a single failure was egregious strongly suggests that the defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical needs." Id. at 1060-61. "In sum, the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant." Id. at 1061. Isolated

incidents relative to a plaintiff's overall treatment suggests no deliberate indifference. Id. at 1060. "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).

Because Defendants are the moving parties, they "bear[] the initial responsibility" of identifying those portions of the record which they believe "demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.

### 2. Failure to Treat, Provide Pain Relief, and Order an MRI

Plaintiff alleges that Defendant Casian was deliberately indifferent to his serious medical needs by refusing to provide treatment or adequate pain management and by refusing to order an MRI. FAC at 8-12.

### a. Medical Appointments and Procedures

The undisputed medical records reveal the following treatment.

On January 21, 2014, Dr. Casian examined Plaintiff as part of his chronic care follow-up. Walters Decl. at Exh. C at 16. Dr. Casian found that Plaintiff's blood pressure was well controlled and noted that she would continue to monitor Plaintiff's urolithiasis. Id. Dr. Casian provided Plaintiff with a cervical pillow and updated his Comprehensive Accommodation Chrono. Id. at 16 and 76.

On February 9, 2014, Plaintiff submitted a Health Care Service Request Form seeking help for a sharp shooting pain in his neck that radiated down his left arm, numbness, and a pins and needles" sensation. FAC at 113; see also Walters Decl. at Exh. C. at 19. Plaintiff stated that the injury was due to the use of excessive force against him on February 7, 2014. Id. Nurse T. Stephenson met with Plaintiff on February 12, 2014 to discuss his concerns. She did not refer Plaintiff for additional care.[3] Id.

---

[3] On February 13, 2014, Plaintiff submitted an Inmate/Parolee Appeal seeking $500,000 in damages for being assaulted and hurt along with physical therapy for his neck. FAC at 71. Plaintiff wrote that he had severe pain in his neck, left arm resulting in a limited range of motion and also experienced dizziness, headaches, and numbness in his arms and fingers after being assaulted by staff. Id.

On February 24, 2014, Plaintiff submitted a Health Care Service Request Form seeking help for extreme pain in his neck, left arm, and hand along with numbness and tingling pain. FAC at 114; see also Walters Decl. at Exh. C. at 23. Plaintiff stated that the pain was due to the use of excessive force against him. Id. Plaintiff also complained that he had headaches, difficulty sleeping or sitting in certain positions, lightheadedness, dizziness, and difficulty showering due to limited mobility. Id. A nurse met with Plaintiff two days later to discuss his concerns and referred him to a primary care provider in two weeks. Walters Decl. at Exh. C. at 24-26. The nurse also told Plaintiff to ice or heat as appropriate, continue with his Naproxen, and to let the staff know if his dizziness and lightheadedness returned. Id.

On March 12, 2014, Plaintiff was examined by Defendant Casian in response to the two requests for medical care that he submitted on February 9 and 24, 2014 due to sharp shooting pains in his neck which radiated down his left arm and resulted in intermittent numbness and pins and needles sensations, headaches, dizziness, feeling lightheaded, and decreased mobility [see FAC at 113-114], all of which Plaintiff alleged was the result of being beaten by other Defendants. Walters Decl. at Exh. C at 28-30; see also Oppo. at 93. Defendant Casian noted that Plaintiff was referred for follow-up care after complaining of neck pain to an RN after a confrontation with a correctional officer on February 7, 2014. Walters Decl. at Exh. C at 28; see also Oppo. at 93. Defendant Casian examined Plaintiff and noted that Plaintiff was able to perform his daily activities, ambulate without assistance, and that his physical examination was unremarkable. Id. Defendant Casian wrote that Plaintiff became uncooperative during the exam and stated that he would submit a 602. Id. Defendant Casian provided Plaintiff with a temporary low bunk order for two months. Walters Decl. at Exh. C at 77. Dr. Casian also limited Plaintiff to "no strenuous activity" and ordered x-rays and a cervical pillow for Plaintiff.[4] FAC at 109; see

_____

[4] On March 18, 2014, Plaintiff submitted an Inmate/Parolee Request. FAC at 91. Plaintiff again requested that his permanent chronos be reinstated and that he be assigned a new primary care provider since Dr. Casian "arbitrarily & capriciously cancelled [his] chronos" and refused to answer him in violation of CCR 3086. Id. On March 19, 2014, Plaintiff submitted a Patient/Inmate Health Care Appeal seeking permanent reinstatement of his medical chronos, specifically, a lower bunk placement, a nineteen-pound lifting restriction and no manual labor or

16cv1736-JLS (BLM)

<u>also</u> Oppo. at 96; Walters Decl. at Exh. C at 77.

On March 23, 2014, Plaintiff submitted two requests for medical care seeking physical therapy, pain medication, the reinstatement of his medical chronos, and refills on his Naproxen and ibuprofen. Walters Decl. at Exh. C at 31; <u>see also</u> FAC at 115 and 118. Plaintiff alleged that he was experiencing pain, pins and needles, numbness, and shooting pains, and could not use his left arm or rotate his neck. Walters Decl. at Exh. C at 31; <u>see also</u> FAC at 115. Plaintiff met with a nurse to discuss these concerns on March 25, 2014. Walters Decl. at Exh. C at 32-34. Plaintiff was referred to meet with his primary care provider in two weeks, told to heat or ice as appropriate, and to take Naproxen while symptoms persisted. <u>Id.</u> The nurse noted that Plaintiff was stable when he left. <u>Id.</u>

Plaintiff was examined by NP Wiley on April 17, 2014 to follow-up on one of his 602 appeals for chronic pain in his neck and back. <u>Id.</u> at 40. NP Wiley ordered trigger point injections to assist with pain relief and noted a negative straight leg test, that Plaintiff was unable to bend his knees to his chest and claimed to be unable to heel walk, or bend and touch his toes or knees.[5] <u>Id.</u>

On May 5, 2014, Plaintiff submitted another health services request form complaining of tingling in his arm and difficulty sleeping, lifting things, and showering. FAC at 116. Plaintiff requested an MRI of his neck and back in light of his x-ray results. <u>Id.</u> Plaintiff was seen by a nurse that day who told Plaintiff to ice or heat as appropriate. Walters Decl. at Exh. C at 44-46. The nurse noted that Plaintiff had a prescription for Naproxen and that he was stable upon release. <u>Id.</u>

On May 13, 2014, Plaintiff submitted a Patient/Inmate Health Care Appeal seeking proper medical treatment including a neck and back MRI, pain management medications, physical

work requiring lifting or brief stooping. <u>Id.</u> at 89-90; <u>see also</u> Oppo. at 98, 101.

[5] On April 30, 2014, Plaintiff submitted an Inmate/Parolee Request for Interview, Item, or Service claiming that he had been "refused chronic medical care services" and seeking assistance. Oppo. at 112.

16cv1736-JLS (BLM)

therapy, permanent chronos for a lower bunk and nineteen-pound lifting restriction, for injuries he received on February 7, 2014 when Defendant Silva use excessive force on Plaintiff and hurt Plaintiff's neck, left arm, shoulder, and back.  FAC at 111; see also Oppo. at 114.  Plaintiff states that he submitted four requests for medical care for diagnosis and treatment and was twice interviewed by nurses but kicked out of his appointment with his primary care provider, Dr. Casian, who accused Plaintiff of faking his injuries and had Plaintiff escorted from her office without providing any medical treatment.  Id. at 112; see also Oppo. at 116.

On May 19, 2014, Plaintiff was evaluated by Defendant Casian after an RN referral for neck pain.  Oppo. at 121.  Dr. Casian wrote that Plaintiff represented that he was independent with his activities of daily living and able to ambulate without assistive devices despite having pain radiate down his left shoulder, intermittent cervicalgia with upper extremity numbness and headache.  Id.  Plaintiff reported pain relief with naproxen and a cervical pillow.  Id.  Plaintiff also reported worsening vision and requested eyeglasses.  Id.  Defendant Casian found that Plaintiff had no significant limitation in functional capacity or red flag symptoms and she referred Plaintiff to physical therapy, education for home exercises, and trigger point therapy.  Id.  She also submitted a referral for optometry.  Id.

On June 11, 2014, Plaintiff had an appointment with Dr. Bates regarding his complaints of left neck pain.  Walters Decl. at Exh. C at 48.  Dr. Bates discussed left neck prolotherapy with Plaintiff who agreed to try it.  Id.  Dr. Bates warned Plaintiff that there would be two days of discomfort before any improvement and performed the procedure which Plaintiff tolerated well. Id.

On July 3, 2014, physical therapist David Clifton recommended referring Plaintiff back to his primary care doctor and providing an MRI or injection therapy.  FAC at 127.

On July 23, 2014, Plaintiff had an appointment with Dr. Bates regarding his complaints of left neck pain.  Oppo. at 126.  Dr. Bates provided another left neck prolotherapy to Plaintiff. Id.  Dr. Bates noted that Plaintiff had been seeing the physical therapist with good results.  Id.

On July 28, 2014, Defendant Casian examined Plaintiff as part of his chronic care follow-up and in response to his form 602 log # 14051135.  Walters Decl. at Exh. C at 52.  At the

appointment, Plaintiff requested an MRI of his neck, back, and shoulder along with pain medication, physical therapy, and lifting restrictions.  Id.  Dr. Casian noted that Plaintiff was enrolled in physical therapy and reported significant improvement of symptoms.  Id.  Plaintiff also received trigger point injections on June 11, 2014 and July 23, 2014.  Id.  Dr. Casian updated Plaintiff's temporary lower bunk restriction and lifting restrictions and determined that an MRI was not medically necessary at that time but noted that she would consider an imagining evaluation for persistent or worsening symptomology.  Id. at 52 and 78.

On August 22, 2014, Dr. Kristen Dean evaluated Plaintiff for a thirty-day follow-up.  Walters Decl. at Exh. C at 56-57.  Dr. Dean noted that Plaintiff complained that his range of motion had decreased since beginning the injections and that he requested an MRI.  Id.  Dr. Dean found no red flag symptoms and recommended that Plaintiff continue physical therapy, treatments with Dr. Bates, and pain management with Tylenol with the addition of amitriptyline.  Id.  Dr. Dean found that no MRI was indicated at the time and to follow up with the primary care provider in four weeks.  Id.

Plaintiff followed up with Dr. Gysler on September 12, 2014.  Walters Decl. at Exh. C at 58.  Dr. Gysler noted that Plaintiff had recently completed physical therapy and that Plaintiff stated he was "doing very well and that the pain is well controlled the best it has been yet."  Id.  Plaintiff's only complaint was that the amitriptyline made him drowsy.  Id.  Plaintiff opted to continue the medicine however to see if his reaction to it would improve.  Id.  Plaintiff also decided to continue prolotherapy.  Id.

On November 24, 2014, Plaintiff had an appointment with Dr. Bates regarding his complaints of left neck pain.  Walters Decl. at Exh. C at 63.  Dr. Bates noted that Plaintiff stated that overall, he was better than on previous visits and noted that Plaintiff's range of motion had improved since his last appointment.  Id.  Dr. Bates gave Plaintiff a trigger point injection and set another visit for 120-180 days.  Id. at 64.

Plaintiff had a follow-up appointment with Dr. Gysler on November 25, 2014.  Id. at 65.  Dr. Gysler updated Plaintiff's chrono to reflect glasses and cotton bedding.  Id.  He also noted his concern with atrophy and that he would request an MRI, increase Plaintiff's amitriptyline,

and follow up in sixty days.  Id.  On November 26, 2014, Dr. Gysler ordered an MRI of the C-Spine for Plaintiff and noted a principle diagnosis of cervicalgia.  FAC at 132; see also Oppo. at 135.  Dr. Gysler further noted that Plaintiff was undergoing injections and physical therapy and had right paracervical musculature atrophy along with c/o radiculopathy and that Plaintiff should be assessed for cord compression.  Id.  The MRI results were compared to Plaintiff's March 14, 2014 x-rays and showed a spinal cord that appeared normal in size, shape, and signal intensity with no tonsillar ectopia seen.  Id. at 134; see also Oppo. at 137.   The MRI impression stated "moderate multilevel cervical spondylosis."  Id.

b. Analysis

Plaintiff argues that Defendant Casian was deliberately indifferent to his medical needs because she denied him medical treatment for several months, refused to order an MRI, and only treated him after he filed various medical grievances.  FAC at 8-10; see also Opp. at 12-13.  The undisputed medical evidence shows that Defendant Casian (1) examined Plaintiff on multiple occasions before and after his alleged assault, (2) provided Plaintiff with a cervical pillow accommodation, (3) provided Plaintiff with a low bunk accommodation, (4) limited Plaintiff to no strenuous activity, (5) referred Plaintiff to physical therapy and to be educated about home exercises, (6) referred Plaintiff for trigger point injections, (7) referred Plaintiff to optometry, (8) ordered x-rays for Plaintiff and (9) twice extended Plaintiff's low bunk accommodation.  Walters Decl. at Exh. D. at 77-78; see also Oppo. at 121.  Plaintiff does not dispute that Defendant Casian performed the listed activities.

Plaintiff claims that Defendant Casian was deliberately indifferent to his serious medical needs because she denied him medical treatment for several months.  Specifically, he suffered without "medical intervention, treatment, and pain-relieving services . . . for over 120 days" and did not receive physical therapy or steroid injections for months after complaining and prescription pain medication, an MRI, and an outside consult for almost a year after his assault.  Oppo. at 20.  Plaintiff does not present any evidence to support his claim that Defendant Casian denied him treatment.  Rather, the undisputed evidence is that while Defendant Casian only saw Plaintiff every couple of months, a number of other medical providers examined Plaintiff in the

22

interim. For example, while Plaintiff did not see Defendant Casian immediately after his alleged assault, he was not left untreated and had medical appointments with Nurse Stephenson who did not feel it necessary to refer Plaintiff for additional care and another nurse who referred Plaintiff to a primary care doctor within two weeks, which is when he was examined by Defendant Casian on March 12, 2014. FAC at 113-114. In addition, between his March 12, 2014 and May 19, 2014 appointments with Defendant Casian, Plaintiff was seen by a nurse on March 24, 2014, NP Wiley on April 17, 2014, and another nurse on May 5, 2014, and received various accommodations, prescriptions for Naproxen and ibuprofen, and instructions to ice and heat as appropriate. Walters Decl. at Exh. C at 32-34, 40, 44-46. In between his May 19, 2014 and July 28, 2014 appointments with Defendant Casian, Plaintiff was seen by Dr. Bates (July 23, 2014) and physical therapist David Clifton (July 3, 2014). Walters Decl. at Exh. C at 48; see also FAC at 127. Dr. Bates began prolotherapy treatments with Plaintiff and his notes state that Plaintiff had "been seeing PT with good results." FAC at 129. David Clifton recommended that Plaintiff get an MRI and/or injection therapy which he received from Dr. Bates. Id. at 127. In September 2014, Plaintiff reported to Dr. Gysler that his pain was well controlled and the best it had ever been. Walters Decl. at Exh. C at 58. As such, Plaintiff has not presented any evidence creating a triable issue of fact to support his claim that Defendant Casian denied Plaintiff medical treatment for several months or only treated him because he filed a grievance. The evidence shows that Plaintiff was consistently examined and treated in the months following his assault. While he was denied an MRI initially because medical staff found that it was not indicated at the time, Plaintiff was x-rayed, and provided with various forms of treatment from the beginning. The fact that Plaintiff had to wait longer than he would have preferred for treatment does not mean that Defendant Casian was deliberately indifferent to his medical care. Even if Defendant Casian did not get it "right" the first time she examined Plaintiff, inadequate treatment, negligence, and even gross negligence are not ground for a constitutional violation. See Wood, 900 F.2d at 1334. Plaintiff's disagreement with the type and timing of care does not create a triable issue of fact. See Kelly, 2018 WL 2106486, at *2 (E.D. al. May 7, 2018) and Evans v. Cty. of San Diego, 2009 WL 3709183, at *12 (S.D. Cal. Nov. 3, 2009) .

Plaintiff also argues that Defendant Casian's statements establish that she denied him medical treatment.  Plaintiff alleges that on March 12, 2014, Defendant Casian told Plaintiff that she thought he was "lying and trying to get narcotic pain medication, don't expect anything from me." FAC at 8.  Plaintiff also alleges that he was forced to leave the appointment without any treatment and was escorted out of the office when Defendant Casian became "upset and belligerent."  Oppo. at 15.  Even assuming the truth of Plaintiff's allegations, the evidence does not create a triable issue of fact regarding deliberate indifference because despite the alleged comments and removal from the examination room, it is undisputed that Defendant Casian interviewed Plaintiff, observed that Plaintiff was able to ambulate without difficulty or assistance and that his motor strength was 5/5, ordered x-rays, adjusted his chronos including providing a low bunk, and advised him to continue taking his NSAIDs as needed.  FAC at 8; see also Walters Decl. at Exh. C at 28, Exh. D at 77.  The fact that Plaintiff believed that Defendant Casian should have provided other treatments to alleviate his pain does not mean that she was deliberately indifferent.  See Colwell, 763 F.3d at 1068 ("A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.") (quoting Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012)); see also Kelly, 2018 WL 2106486, at *2 (same); Evans, 2009 WL 3709183, at *12 (Report and Recommendation stating that at "most, Plaintiff has shown a difference of medical opinion among his treating doctors or a difference in opinion between him and medical personnel. This is not deliberate indifference, and mere negligence is not sufficient to survive a motion for summary judgment.") (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).  This disagreement also does not create a triable issue of fact regarding the constitutionality of Defendant Casian's care.  Estelle, 429 U.S. at 105.  Similarly, while Plaintiff argues that during his May 19, 2014 appointment with Defendant Casian she informed him that she was only ordering treatment for Plaintiff because she was "tired of [Plaintiff's] complaints[,]" the undisputed evidence shows that she examined Plaintiff, and referred him to physical therapy, home exercise education, trigger point therapy, and optometry.  FAC at 10; see also Oppo. at 17, 121.  Defendant Casian's comments, even if true, do not create a triable issue of fact as to

deliberate indifference.

Plaintiff argues that Defendant Casian was deliberately indifferent to his medical needs when she unreasonably denied his request for an MRI. FAC at 10; see also Oppo. at 19-20. At the July 28, 2014 appointment, Defendant Casian examined Plaintiff and found that there was no edema, no masses or deformities in his neck examination, and that he had 5/5 for motor strength in all four extremities. Walters Decl. at Exh. C at 52. Defendant Casian also noted that Plaintiff was enrolled in physical therapy and reported significant improvement of symptoms and was satisfied with the results of his trigger point injections. Id. After considering all of the information, Defendant Casian noted that "[a]n MRI of the cervical spine, lumbar spine and shoulder is not medically necessary at this time." Id. This sentiment was shared by Dr. Dean who examined Plaintiff less than a month later on August 22, 2014 and concluded "[no] MRI indicated at this time." Id. at 56. The fact that another doctor had a different opinion four months later (November 25, 2014) and ordered an MRI [see id. at 65] does not mean that Defendant Casian's decision to not order an MRI in July was wrong, let alone deliberately indifferent.

Plaintiff argues that an MRI was recommended before his July 2014 appointment with Defendant Casian by physical therapist David Clifton. FAC at 10. However, the evidence shows that David Clifton recommended an "MRI and/or injection therapy" and Plaintiff already was receiving steroid injections for pain. Id. at 10, 127 (emphasis added). As such, Mr. Clifton's alternative recommendation does not create a triable issue of fact as to deliberate indifference; at most, it could create a slight difference of medical opinion. See Singleton, 577 F. App'x at 735 ("[a]lthough officials at another California state prison had granted some of these accommodations, a difference of opinion on medical treatment is not enough to establish deliberate indifference so long as the care provided was medically acceptable.").

Plaintiff further argues that Defendant Casian's interrogatory responses demonstrate her deliberate indifference with regard to failing to order an MRI. Oppo. at 22. Interrogatory No. 6 asks Defendant Casian to describe in detail her to decision to not order an MRI on Plaintiff's neck, lumbar spine, and shoulder after his July 28, 2014 visit. Id. at 146-147. Defendant Casian

responded that she did not order an MRI that day because Plaintiff "reported symptomatic relief with conservative medical care (physical therapy and trigger point injection), and physical examination was normal – history and physical examination did not show evidence of neurological deficit, and the patient did not complain of difficulty performing ADL's (grooming, feeding, transfer.)" Oppo. at 147; see also Walters Decl. at Exh. C at 52. Defendant Casian concluded that an MRI was not indicated at that time and that she would "consider imaging evaluation for persistent worsening symptomology." Walters Decl. at Exh. C at 52. Plaintiff has not submitted any evidence indicating that Defendant Casian's assessment was inappropriate Similarly, Plaintiff's interrogatory No. 13 asked for the most widely accepted form of technology for detecting "blood clots or other vascular occlusions, spinal or nerve impingement, soft tissue or nerve damage[,]" and Defendant Casian responded

> While x-rays are valuable diagnostic tools, in general, conditions such as these are not diagnosed solely with an x-ray. Vascular/arterial Doppler ultrasound or CT angiography are used to diagnose blood clots or vascular occlusions. Soft tissue damage is mostly a clinical diagnosis, occasionally requires imaging studies (CT, MRI). If a patient fails the initial approach with conservative medical care, and continues to experience neck pain with radiculopathy that affects ADL's, an MRI is indicated.

Id. at 149. Neither of these responses support Plaintiff's argument that Defendant Casian provided unconstitutional care to Plaintiff. [6] Even viewing all of the evidence in the light most favorable to Plaintiff, Plaintiff has not presented evidence creating a triable issue of fact as to whether Defendant Casian was deliberately indifferent to Plaintiff's serious medical needs when she denied his request for an MRI. At most, the evidence shows a difference in opinion between Plaintiff and Defendant Casian. To the extent the care was different than what Plaintiff wanted

---

[6] Plaintiff spends a significant portion of his opposition arguing that Defendant Casian's interrogatory responses establish that she acted with deliberate indifference in providing medical care. Oppo. at 20-22. The Court has carefully reviewed all of the interrogatory responses and considered Plaintiff's arguments and finds that the responses do not create a triable issue of fact as to Plaintiff's deliberate indifference claim against Defendant Casian. At most, they illustrate the disagreement between the care Plaintiff wanted and the treatment Defendant Casian believed was medically appropriate.

16cv1736-JLS (BLM)

or less than ideal, such care does not support a finding of deliberate indifference.  See Estelle, 429 U.S. at 106 ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."); see also Wood, 900 F.2d at 1334 (noting that even gross negligence is insufficient to establish deliberate indifference to serious medical needs); and Johnson v. Fortune, 2016 WL 1461516, at *2 (E.D. Cal. April 4, 2016) ("a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a [§] 1983 claim.") (quoting Franklin v. Oregon, 662 F.2d 1337, 1344) (9th Cir. 1981).

### 3. Revocation of Accommodation Chronos

Plaintiff's final argument is that Defendant Casian displayed her deliberate indifference to Plaintiff's medical needs by arbitrarily terminating all of his permanent medical accommodation chronos.  FAC at 9.  Plaintiff argues that in 2012, his accommodation chronos were reinstated "permanently in perpetuity at all future CDC institutions."  Id.  In support, Plaintiff cites to an April 23, 2012 Institution Response for First Level HC Appeal.  Id. at 94.  The response, which was written to address Plaintiff's request that his nineteen-pound lifting restriction and low bunk placement accommodations be made permanent and honored at North Kern State Prison, states that "Dr. Flores completed a CDC 7410 Comprehensive Accommodation Chrono for permanent lower bunk and for [Plaintiff] not to lift anything more than or equal to 20 pounds."  Id.

Defendants contend that Plaintiff's claim "is refuted by the undisputed evidence."  MSJ at 7.  Defendants note that Plaintiff's chronos were not permanent and consistent before February 2014 and that they were often updated and modified throughout Plaintiff's treatment by Defendant Casian.  Id. at 8.

The parties submitted uncontested evidence establishing that the following accommodation chronos were issued for Plaintiff:

- February 2003. Plaintiff was given a medical chrono while at R.J. Donovan Correctional Facility noting that he was to receive cotton bedding, a lower/bottom bunk, and that he was not to lift more than "19 pounds PERMANENT 04-05-2013 Months."  Oppo. at 78; see also FAC at 99.

- May 18, 2010. Plaintiff received a Comprehensive Accommodation Chrono calling

27

for placement on the bottom bunk and cotton bedding.  FAC at 100; <u>see</u> <u>also</u> Oppo. at 74.  The accommodations were written as permanent and the form noted that "[c]hronos indicating permanent accommodations shall be reviewed annually.  This form shall be honored as a permanent chrono at all institutions."  <u>Id.</u>

- November 24, 2010. A Medical Classification Chrono signed by Zaed Norman noted that the level of care Plaintiff required was "OP" and that he had no particular need for "proximity to consult", was capable of vigorous activity, at low medical risk, and needed basic nursing.  Walters Decl. at Exh. D at 69.

- March 11, 2011. A chrono limiting Plaintiff to no lifting over forty pounds and recommending low bunk placement for one year signed by Dr. B. Ree at California Men's Colony.  Oppo. at 75.

- July 12, 2011. A Chrono restricting Plaintiff to no lifting over 19 pounds was completed at California Men's Colony by Dr. S.P. Oppo. at 76.  The accommodation was listed as permanent.  <u>Id.</u>

- January 23, 2012.  Dr. Flores completed a medical chrono noting that the level of care Plaintiff required was "OP" and that he had no particular need for "proximity to consult[,]" was capable of full duty, at low medical risk, and needed low-intensity nursing.  Walters Decl. at Exh. D at 70.

- February 17, 2012.  Comprehensive Accommodation Chrono completed by Dr. Flores noted that Plaintiff should be temporarily placed on the bottom bunk (until July 31, 2012), be given cotton blankets permanently, and should not lift more than nineteen pounds.  <u>Id.</u> at Exh. D. at 71.

- April 6, 2012.  Comprehensive Accommodation Chrono from Dr. Flores called for a permanent bottom bunk placement, permanent cotton bedding, and a lifting restriction of 19 pounds.  <u>Id.</u> at Exh D. at 72; <u>see</u> <u>also</u> FAC at 103 and Oppo. at 77.

- May 15, 2013. Medical Classification Chrono completed by Defendant Casian noted that the level of care Plaintiff required was "OP" and that he needed infrequent

28

basic consultation for "proximity to consult", was capable of full duty, at low medical risk, and needed low-intensity nursing. Walters Decl. at Exh. D. at 73. In the comments section, Defendant Casian noted "LBP."[7] Id.

- October 18, 2013. Medical Classification Chrono signed by PA J. Lee noted that Plaintiff needed infrequent basic consultation for "proximity to consult", was capable of full duty, at low medical risk, and needed low-intensity nursing. Id. at 74. It further noted "CLBP", that Plaintiff could ambulate on his own, needed a cotton blanket, and could not lift more than nineteen pounds. Id. Plaintiff was restricted to "Cocci Area 2" and see CDCR 1845 and 7410 was checked. Id.

- January 21, 2014. Comprehensive Accommodation Chrono completed by Defendant Casian called for a permanent cervical pillow accommodation and no strenuous activity. Id. at 76.

- January 29, 2014. Medical Classification Chrono signed by NP Velardi noted that the level of care Plaintiff required was "OP" and that he needed infrequent basic consultation for "proximity to consult", was capable of limited duty, at medium medical risk, and needed basic nursing. Id. at 75. It also noted "no 1845," no strenuous activity, and authorized a cervical pillow. Id. Plaintiff was restricted to "Cocci Area 2" and noted as having durable medical equipment. Id.

- March 12, 2014. Comprehensive Accommodation Chrono completed by Defendant Casian called for a temporary sixty-day low bunk placement, a permanent cervical

---

[7] Plaintiff argues that LBP stands for lower bunk permanent [see Oppo. at n.6], however, the Court notes that LBP or CLBP is typically used as an acronym for low back pain or chronic low back pain. See Papenfus v. Oregon Dep't of Corr., 2006 WL 2795102, at *1 (D. Or. Sept. 26, 2006) ("Plaintiff followed sick call procedure for complaints of low back pain (LBP)"); see also Hoffman v. Khatri, 2010 WL 3063293, at *2 (S.D. Cal. Aug. 3, 2010) ("Plaintiff was advised to "continue gentle stretching," and engaged in an 'extensive discuss[ion] re: chronic nature of his LBP (lower back pain)."); https://www.medilexicon.com/about, and https://www.medicinenet.com/common_medical_abbreviations_and_terms/article.htm.

16cv1736-JLS (BLM)

pillow accommodation and no strenuous activity.  Id. at 77.

- July 28, 2014.  Comprehensive Accommodation Chrono completed by Defendant Casian provides Plaintiff with a temporary low bunk accommodation until January 28, 2015, a permanent cervical pillow accommodation, and notes no strenuous activity or lifting more than twenty pounds.  Id. at 78.

- November 26, 2014.  Comprehensive Accommodation Chrono signed by Dr. Gysler renewed the temporary low bunk placement until February 28, 2015 and provided a cervical pillow (permanent), one pair of glasses, and cotton bedding (permanent).  Id. at 79.  It also called for no strenuous activity or lifting over 20 pounds.  Id.

- September 28, 2015.  Comprehensive Accommodation Chrono signed by Robert Walker noted a permanent bottom bunk accommodation and stated that "Pt has mod to severe spinal stenosis and decreased range of motion in cervical spine and not surgical candidate and requesting lower bunk because jumping off bunk is causing significant pain and parethesias and worsening."  Id. at 80.

As set forth above, there is ample uncontested evidence that Plaintiff was provided numerous accommodation chronos, including chronos issued by Defendant Casian, and there is no evidence to support Plaintiff's claim that Defendant Casian terminated all of Plaintiff's accommodation chronos.  Rather, the evidence establishes that throughout the time Defendant Casian treated Plaintiff, she signed off on accommodations for low bunk placement [see Walters Decl. at Exh. D at 77], cervical pillows [id. at 76-77], no strenuous activity [id.], and weight lifting restrictions [id. at 78].  To the extent Plaintiff is arguing that Defendant Casian's March 12, 2014 chronos limiting Plaintiff's lower bunk placement to sixty days or July 28, 2014 chrono limiting Plaintiff's lower bunk placement to six months constitute a termination of Plaintiff's permanent accommodations and, therefore, a violation of the Eighth Amendment, the argument is without merit.  First, Defendant Casian's chronos do not terminate Plaintiff's lower bunk status; they extend it.  Second, while Plaintiff claims his accommodations were "permanently in perpetuity[,]" the evidence clearly shows that in this context, permanent does not mean forever.

16cv1736-JLS (BLM)

The duty limitation form from California Men's Colony specifies that permanent can mean anything from six months to a year or more. Oppo. at 76. The CDCR 7410 Comprehensive Accommodation Chrono Form clearly states that permanent accommodations which shall be honored at all institutions, "shall be reviewed annually." Walters Decl. at Exh. D at 72, 76-79; <u>see also</u> Oppo. at 74; FAC at 100; <u>Raul Alvarez v. Dr. Hashemi</u>, 2019 WL 1099838, at *3 (E.D. Cal. Mar. 8, 2019) (noting that Defendant's list of undisputed facts stated that a CDCR permanent chrono "is to be reviewed at least annually by a medical professional to determine its continued medical necessity"); and <u>Hanna v. Chudy</u>, 2014 WL 4629064, at *2 (N.D. Cal. Sept. 16, 2014) (citing the Inmate Medical Services Policies & Procedures manual which contains the policies and procedures governing the delivery of medical care to patient-inmates for California Correctional Health Care Services and noting that it states "[f]or accommodations that are designated as permanent, the accommodation must be reviewed annually"). Third, Plaintiff presents no evidence to support his claim that Defendant Casian's decision to limit the lower bunk restriction to sixty days followed by an additional six months constitutes deliberate indifference. Rather, at most, it could be considered a difference of opinion between Plaintiff and Defendant Casian as to the appropriate length of the limitation. This is not sufficient to establish deliberate indifference. <u>See Singleton</u>, 577 F. App'x at 735 ("[a]lthough officials at another California state prison had granted some of these accommodations, a difference of opinion on medical treatment is not enough to establish deliberate indifference so long as the care provided was medically acceptable.") (citing <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996)).

For the above-stated reasons, this Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's deliberate indifference claim against Defendant Casian.

<u>**CONCLUSION**</u>

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court issue an order: (1) approving and adopting this Report and Recommendation, (2) granting in part and denying in part Defendants' Motion for Summary Judgment.

16cv1736-JLS (BLM)

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties **no later than May 9, 2019**.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with this Court and served on all parties **no later than June 6, 2019**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

Dated:  4/11/2019

Hon. Barbara L. Major
United States Magistrate Judge

16cv1736-JLS (BLM)